The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Peter C. Cavanaugh presiding. Very good. Council, we'll call the next matter, which is 4-21-0262, People of the State of Illinois v. Fox. Council for the Appellant, please state your name for the record. My name is Phil Payne from the State Appellate Defender for Durell Fox. Thank you for the appellee. Timothy Londrigan for the State's Attorney Appellate Prosecutor's Office. Very good. Council, you may proceed. Good afternoon, Your Honors, and may it please the Court. Again, I'm Phil Payne, and I'm here on behalf of Durell Fox, who appeals his conviction for first-degree murder. I'll start with Issue 1, and if there's time, I'd like to turn briefly to Issues 3 and 4, but I welcome any questions on any of the issues. Illinois Rule of Evidence 902 subsection 11 provides a substitute for live sworn testimony for the limited purpose of laying a foundation for the business records exception to the hearsay rule. But while that rule allows for a certification to stand in lieu of a live witness in the courtroom, the rule does not dispense with the oath requirement. Rather, its plain language expressly requires that such a certification be, quote, a declaration under oath subject to the penalty of perjury. And the reason is obvious. It's the same reason that every live witness is required to take an oath before testifying in court, to induce that individual to provide truthful information to the court or else face the full power of the state's enforcement of its perjury statute. For someone to be subjected to the penalty of perjury, wouldn't it have had to be under oath? And can't we assume that? Your Honor, I don't think that you can assume that these individuals were under oath, where the only possible suggestion or hint that they were under oath is their protestation that they were subject to the penalty of perjury. There needs to be some indication on the face of the certificate, or perhaps elsewhere in the record, indicating that those individuals were in fact under oath, that they took an oath administered by an individual who is authorized to give an oath under the Oaths and Affirmations Act. Your Honor, you didn't answer Justice Enoff's question. Can someone really declare under penalty of perjury without being under oath? No, I do not believe that a person can unilaterally invoke the penalties of perjury or subject themselves to the penalties of perjury without first taking an oath. So that's implicit, but not good enough? Well, Your Honor, I don't believe that it's implicit here that anyone was under oath, where none of the certifications... The certifications declare under penalty of perjury. So if you can't, without having taken an oath, be subject to a penalty of perjury, then it's implicit, but your position is the Supreme Court rule requires that other language? The rule of evidence requires that the certification in fact be under oath. And in order for the certification or the certifying signatory to be under oath, there has to be a showing that an oath was given and taken. Based on the face of these certifications, there's no indication that the certifying signatories took any oath. There's no indication that they took an oath from a person who's authorized to issue an oath. All that the face of the certifications indicate was that they somehow believe they could invoke the exposure to the perjury penalty statute by merely encanting those words on their own. And the tight timeframe in which these certifications were turned around in this case provide powerful evidence that that is what happened. The state obtained this last round of certifications on the literal eve of trial, after hours. And in the prosecutor's own words, he was up at night on the phone with these cell phone carriers trying to fix these certifications that had a prior defect. So there's every indication or every reason to believe that in this case, the people who signed these certifications were just putting their name on the line where the state asked for it, and they were not actually under oath. The recent decision in People v. Huck provides a very well-reasoned roadmap for analyzing this issue. In that case, the court faced a very similar factual scenario where the certification said the signatories were, quote, duly sworn, but otherwise had no indication that an actual oath was given or by whom that oath was administered, and the appellate court found the rule was unsatisfied. The Huck decision faithfully applies the rules of statutory construction to Rule 902 Sub 11 to determine that it's, quote, under oath language mandates that the certification be given under oath. And it's the giving of the oath that triggers the signatory to the penalties of perjury. Without the oath, perjury cannot follow. The state, in its brief, makes no mention of Huck. Instead, the state takes the position that one can be found guilty of perjury where the custodian specifically provides in writing that he or she is subjecting themselves to the provisions of perjury. But Illinois law does not allow an individual to subject themselves to perjury. It's crystal clear that the oath has to come first and followed by the falsehood given under oath. That's when perjury liability can attach. The state's reading would allow for the admission of evidence based on a certification where the threat of perjury is illusory, and that can't be squared with the language of Rule 902 Sub 11 or with Huck. To see the flaw in the state's argument, it's helpful to look to Huck's comparison of the Illinois Rule 902 Sub 11 and its federal counterpart. Now, those rules are similar in many ways, but the Illinois drafters departed from the federal rule in an important way. And I'll just read from Huck very briefly because they said it better than I could. While the federal rules of evidence allow for the admission of self-authenticating business records by means of a certification supported by an unsworn declaration under penalty of perjury, Illinois does not. Illinois Rule of Evidence 902 Sub 11 differs significantly from the federal rule in that it requires a written declaration under oath subject to the penalty of perjury. That requirement flatly was not met here. And so the court erred in admitting the cell phone records where the certifications setting forth their foundation did not meet the requirements for Rule 902 Sub 11. Your Honors, that issue... If we were to agree that the admission was error here, wasn't this error harmless in this case? Thank you for that question. I was just turning to harmless error, Your Honor. The error in this case was not harmless. The state, due to this error, was allowed to present voluminous records from three cell phone carriers, including call logs and cell phone tower location data that was held out by the state to the jury as presenting an unbiased, dispassionate mapping of the co-defendants movements during and after the shooting. The cell phone evidence was not cumulative or redundant to the other evidence presented by the state because no other evidence presented at Mr. Fox's trial purported to track his movements electronically during and after the shooting. Nor did any other trial evidence claim to catalog dozens of telephonic contacts between Durrell and his co-defendants in the relevant timeframe. The cell phone records were... But we had personal identifications here. By Wheeler, we had the testimony about Bob's, what Bob's did, what Stephanie Bob's did. We have lots of other evidence. We have physical evidence here as well. So, how is there a reasonable probability that the defendant would have been acquitted even without these records? I believe that there is not only a reasonable probability, but the state didn't prove beyond a reasonable doubt that this error was harmless. And that's the proper framework for analyzing whether this issue was harmless. Wait, wait, wait. What is beyond a reasonable doubt? What is the basis for that claim? Why is it whether the error was harmless? I believe, and I could be incorrect, Your Honor, I could be conflating my legal standards, but I thought that the harmless error analysis held the state to prove the error harmless beyond a reasonable doubt. Only if it's a constitutional violation, counsel. I know all errors in OSAD's eyes have to be proved beyond a reasonable doubt, but in fact, that's not the law. Well, I stand corrected, Justice Duggan, and forgive me. Regardless, the error does need to be proven harmless, and it can't be proven harmless in this situation. Now, to Justice Zinoff's question, true, there was an eyewitness in this case, Ashley Wheeler. She was a single eyewitness in this case whose own account of the shooting was contradicted by two other individuals who were at the scene. Stephanie Babb's testimony, critically, her credibility was salvaged by the cell phone records that were inadmissible under Rule 902 Sub 11. She had all the incentive to fabricate. She was testifying in exchange for a grant of immunity, and her credibility was in question from the jump, and the state knew it. And so it spared no effort in closing argument, contending that Babb should be believed despite her credibility problems, and the state exploited these inadmissible cell phone records to convince the jury she was honest. The state told the jury, quote, and all of these phone records show she's telling them exactly the truth from the beginning to the end. The state recapitulated that refraining in rebuttal. Justice Zinoff pointed out that we have an eyewitness to this shooting. Wheeler, what was the problem with her testimony? Well, her testimony was problematic, and the record bears this out, Your Honor, because her opportunity to view anything of the shooting was called into question by the state's own other witnesses. Shaquia Smith and Seneca Givens were in the house at the same time of the shooting. It was undisputed, all three parties agreed that the door, the front door through which Wheeler would claim to see Durrell Fox chasing Demacio Lovelace was closed at the beginning. Ashley Wheeler contended that she or someone else, she wasn't sure, opened the door momentarily, and she saw through and saw Durrell Fox chasing Demacio Lovelace and the two other individuals in the van. But Seneca Givens testified that the door was never even opened, and I think Shaquia Smith testified that the door may have been open for maybe a few seconds, but the opportunity for anyone to see who shot anyone in this case or who was present is in doubt. Is there any evidence in this record to show that Wheeler had some sort of animus against this defendant and was therefore perhaps likely to lie to implicate him? There is no indication that I can think of that she had a personal grievance against Durrell Fox. She identified Sean Eubanks as her cousin, but there was no prior beef, so to speak, between Ashley Wheeler and the defendant. And there are also identification cases where there's sometimes fleeting identification involving people who have never seen each other before. She knew the defendant in this case for years, didn't she? She claimed to have known the defendant and her cousin, obviously. Is there some dispute? Well, to go back to your question about a possible animus between the parties, I would like to point out that the motive proposed by the state in this case for the shooting in the first place was that Demacio and the victim and Durrell Fox had some kind of prior road rage incident where Demacio Lovelace had run Durrell Fox off the road, something like that. So I cannot speak to what all the possible history between these parties is, but what is clear from the record is that Ashley Wheeler's opportunity to see the shooting was fleeting in and of itself, and that the state's own reliance on the cell phone records at trial is the most telling indicator of its significance. What about the testimony of Babb, who was the defendant's girlfriend at the time? How should the jury of this court view the testimony of the detailed steps she took at the defendant's direction to destroy his clothing and an automobile? Isn't that pretty damning testimony? I would say that it is damning testimony if you believe Stephanie Babb. Pause it right there. Why should the jury not have believed Stephanie Babb, and what evidence is there in this record that should cause us to doubt her testimony? Well, first, Stephanie Babb was not forthcoming to the police when she first spoke with them. Her story evolved over time. She was, as I mentioned, testifying for the state in exchange for a grant of immunity to obstruction of justice charges. And the state knew that she faced credibility problems because they used and exploited the inadmissible cell phone records in this case to prop up her credibility. They spared no effort to hold her testimony up in line with the cell phone record evidence and show that they were somehow consistent. Pause it right there. The fact that she was a reluctant witness, didn't want to come forward or tell different stories to the police initially, isn't that a reflection of her connection to the defendant, not wanting to incriminate him? Which would, in any sense, show that when she finally does, this is without animus and without motive to harm him. There is no doubt, based on this record, that by the time trial rolled around, Stephanie Babb had no love lost for Darrell Fox. They were no longer together, no longer associated with one another. So there's no reason to believe that she was trying to do him any favors when she testified at trial. But he pointed out her reluctance at first as somehow diminishing her credibility. She was his girlfriend. Your Honor, I respectfully submit that anyone whose story changes over time is, without further explanation, less credible than someone who tells the same story from the jump. And where the state protests too much, to quote the Bard, in how credible she is at trial, where they spare no possible effort to draw and delineate the consistencies between Stephanie Babb's testimony and all of this inadmissible cell phone evidence, you cannot find that cell phone evidence to be harmless. Because they're emphasizing the importance of Stephanie Babb's testimony to the jury, and then they are emphasizing, in tandem, the cell phone records that purport to corroborate her testimony. Without that cell phone evidence, her testimony becomes way, way more wobbly, so to speak. But it's corroborated. We've got physical evidence of Wheeler's hat, the DNA evidence. We've got that. The jury had that also. So, I mean, with that, the cell phone evidence, I think, becomes far less important, doesn't it, counsel? I think that when evaluating the harmlessness or the harmfulness of evidence, there's no better party to ask of its importance than the state itself. And the record in this case indicates the state, where it leaned heavily, heavily on this cell phone evidence, to convince the jury that its witnesses were telling the truth, despite their credibility problems, despite their reliability problems, that this evidence cannot be considered harmless. Notwithstanding the other evidence against Jarrell Fox, we do not submit that this evidence was insufficient to convict, but the error in admitting the cell phone evidence was certainly not harmless. The cell phone record evidence was not an afterthought at his trial. It was an emphatic bookend, Your Honor. The powerful conclusion of the state's case in chief meant to shore up any weaknesses in hearing in the state's witnesses and to provide powerful, independent evidence of Fox's inculpatory whereabouts before, after, and during the shooting. And so in this case, Your Honors, I respectfully say that this issue cannot be considered harmless. But if Your Honors are not convinced and you do not believe that a new trial was warranted, this court should nonetheless remand for further post-trial proceedings to address the lingering conflict of interest issues best upon its preliminary crank length. I have two more minutes. I'll try to get through this quickly. After trial, Fox filed a pro se motion to dismiss trial counsel, and included in that was a claim that Aaron Root, defense counsel Root, labored under a conflict of interest. How was the Krankel hearing deficient? The Krankel hearing was deficient, Your Honor, because in addressing the issue of the conflict of interest, or the potential conflict of interest, I should say, the court, in its questioning of Root, trained its questions and its inquiry only at the issue of whether a per se conflict existed. It did not explore at all, in any way, whether an actual conflict of interest may have arisen by virtue of her prior representation of Demetrio Lovelace. And the Illinois Supreme Court very recently has been crystal clear that, quote, the procedures encourage it, the procedure, the Krankel procedure, encourages the trial court to fully address the claims and thereby narrow the issues to be addressed on appeal. That's from People v. Radis. Radis goes on to say, we find that even in a preliminary Krankel inquiry, a trial court must be able to consider the merits in their entirety when determining whether to appoint new counsel. So in this case, the court, and we acknowledge the court, interrogated the issue of whether a per se conflict existed, and that issue is settled. But the court made no effort to inquire whether Root was laboring under an actual conflict of interest, and where that question went completely unexplored, that justifies a remand for further Krankel inquiry, a preliminary Krankel inquiry, where that question can be answered more thoroughly or thoroughly at all. So for those reasons, we ask that this court reverse Drell Fox's conviction for first-degree murder and remand for a new trial, or at the very least, remand for further post-trial proceedings consistent with Krankel. Thank you, Your Honors. Thank you, counsel. Mr. Lonergan for the appellee. Thank you, Your Honors. May it please the court. With respect to issue number one, it's the state's position that this has to be considered forfeited. This particular issue has to do with the technical requirements of a foundationary to admit evidence. And as opposing counsel just brought out in his argument, the court already had this issue before it, because objections were raised as to whether or not the state was meeting the requirements of 902.11. Defendant brought up the case of People v. Kent, suggesting that the affidavits submitted by the state were insufficient because they didn't meet the criteria established in Kent. The state or the court agreed with the defendant and did not grant the state's motion to admit this evidence, but gave the state leave to amend its affidavit. And that's exactly what the state did. It went back, cured the defects that were in its affidavit, and resubmitted the affidavits the following day. The trial court then reviewed them again, saw that they met and satisfied the court's concerns with regard to the Kent decision, and then admitted this evidence. I don't think anybody can seriously argue that if defendant did not bring up this issue of whether or not there was sufficient language suggesting that the declarant was sworn or under oath, that that too would not have been cured by the state, if given the opportunity. This is exactly the reason that we have the forfeiture rule, is to avoid these type of basically gotcha. Didn't the defendant object the trial to the certificates? A trial judge? No, I don't believe that he did, or she did. I can't recall with certainty, but it's my recollection that the defense counsel did object the following morning when the state submitted its new affidavits. But it stood on the same arguments that it made the previous day, that they did not conform appropriately with Kent. I think in the middle of trial, there were no further... Let me be more clear. The defendant objected to the certificates. The state purported to correct the means, or the problem with the certificates, and the trial court said that's okay. The amended certificate now does that. Is that what happened? Yes. Well, did the defendant ever say, oh, all my objections are now taken care of and I have no further objections to the certificates? No, as I quoted my brief, the defendant or defense counsel made a statement to the effect that he still did not, or she did not feel as though the new affidavits met the spirit of 902.11. Why isn't that close enough to alert the trial court that there's a problem? Because it did not alert either the state nor the trial court as to the issue that's now being presented on appeal. And that's whether or not there needs to be language in these affidavits pertaining to whether or not the declarant was under oath. Counsel, you do a nice job and you've done a nice job for a long time arguing cases on behalf of SAFT. So this is not a tricky question, but this is a rule of the Illinois Supreme Court, Rule 902. They wrote it. Their evidence commission wrote it and they adopted it. And the language of 902 contains, the language of issue of 902 contains nine words by the Supreme Court Committee, under oath and subject to the penalty of perjury. Now, on what possible basis should we be inclined to excuse the state from following those nine words when they prepare a certificate pursuant to Supreme Court rule? And typically certificates, as Mr. Payne, I believe, as Mr. Payne has pointed out, this is important stuff. And it was used importantly in this case. And what possible reason should we have to say, well, you know, subject to the penalty of perjury is enough. It's inferential that it must mean under oath and so forth. We're talking about nine words in a rule set forth by the Supreme Court Evidence Committee. It seems to me could hardly be easier to follow. Well, Judge, I'm not asking that this court excuse the state's failure to follow it. I'm arguing that the state did in fact follow it, that the specific language. Well, those nine words don't appear in the certificates, do they? No, but the certificate doesn't require that those nine words. Well, why doesn't this rule, if there's any question about it, why should we say the Supreme Court Rules Committee drafted this rule of evidence met what they said, that it must be made under oath and subject to the penalty of perjury? It must show that on the certificate. Well, the rule itself doesn't state that the certificate has to recite that. It simply states that it has to be under oath. If someone declares that they're being that they're making these statements subject to perjury, and we all agree that in order to be subject to perjury, you have to be under oath. There's a clear implication that the declarant is stating that he is under oath, and therefore he's making these statements under. You're probably right, there's a clear indication, but why should we settle for that? The last paragraph of the rule says the word certification as used in this subsection means with respect to a domestic record, a written declaration under oath subject to the penalty of perjury. I mean, you know, it's been a long time since I was a prosecutor, but that would have been a good clue for me when I'm preparing documents to think, you know, it's the old joke is, you know, when all else fails, let's read the statute, or in this case, let's read the rule and follow it. What's the issue here? Well, apparently, you know, it's not clear to all the state's attorneys throughout the state. Must not be. You were a trial counsel, Mr. Lodgerton, you do a nice job of trying to explain this stuff and defend it, that it's not your fault. No, I understand, Judge. And, you know, I perfectly I don't see my job is trying to defend the state under any pretense, you know, my job is to assist the court in trying to see that the right ruling is discovered and adhered to. So, you know, if this. So, I was just going to just turn for a minute to the issue of harmless error. Counsel argued vociferously that the cell phone records were integral to the case, and therefore, we could not and should not find harmless error. How do you respond to that argument please. Well, I just don't think there's any basis for that at all in the record, Your Honor, clearly, this gentleman's being accused of murdering another individual. As you pointed out, there's significant evidence at this trial eyewitness testimony supporting testimony that this defendant was seen running across the front yard shooting at the victim. You've got the testimony of Ashley Wheeler to that effect. And these telephone records have absolutely nothing to do with Ashley Wheeler's testimony. Her testimony is supported by that. I think it's Tyreen Green, who is also parked in close proximity to this scene and saw Miss Wheeler screaming in the front yard that her baby daddy had just been shot. And he found the victim's body in the woods in the area he was waiting for the victim I assume he was a friend of the victims at the time. And then you have Stephanie Babb, who's basically testifying as to what the movements of the defendant were after the murder and prior to his arrest. And perhaps you can say that these telephone records somewhat support her testimony, but her testimony is not critical to the defendant's conviction. I mean, she's suggesting that he destroyed evidence and that he burnt the car, burnt his clothes, and did these other actions which would suggest guilt. But clearly the testimony to put this guy behind bars is that of Ashley Wheeler and Tyreen Green. So, this is cumulative evidence. It's not critical to any specific point. The only thing these phone records are really doing is showing who he called, the duration of the call, and the date and time of the call. You know, counsel is trying to suggest that these records can isolate where this call is being made from and I don't believe that's true. I don't think we have that technology. I think at best it shows what towers the defendant's phone might have pinged off of and give you a very general vague idea of where he could possibly be located. But it certainly doesn't state that he's on the corner of Fifth and Green when he's making this call at 542. They simply don't have that sophistication. And so when it comes down to trying to find out where he's at, specifically when he's making these calls, these records don't do that at all. Not with any specificity required to really accomplish anything. So, no, these records are harmless. You know, they weren't that significant at all. With regard to the harmless air issue that I, or I'm sorry, the second issue that was brought up I think it was the crankle. Right, the crankle hearing and conflict of interest issue. And why counsel indicated that the crankle hearing was deficient because the judge did not explore actual prejudice, as opposed to just per se, per se, conflict, I'm sorry actual conflict as opposed to a per se conflict. And what is your response to that. Well, I couldn't disagree more. I think if you read the record, the judge performed an exemplary crankle hearing. He asked this gentleman, the defendant, you know what's the basis for your claim I want you to tell me all about it. And he asked the gentleman repeatedly to explain what it was that he had to say in support of this allegation of conflict. And he said nothing. There was nothing that he could offer other than the fact that at one time his counsel represented the victim. That's clearly a per se claim. When asked repeatedly if he had anything else to say in support of that. Something suggesting that his counsel failed to do something or did something that she would not have otherwise done if she didn't represent the victim in the past, you know, she's the defendants required to point to specific deficiencies and his counsel strategy tactics or decision making, it's attributable to the alleged conflict. That's what is required by an actual conflict, and this defendant never attempted to do that. Afterwards, in his motion to acquit. Didn't the information regarding the actual conflict come up later after the crankle hearing in his motion to acquit that he filed afterwards. No, I think there was a hearing on September 9, if memory serves, at which time the court conducted the crackle hearing, and the court went blow by blow over every day I think he had five contentions of of ineffective counsel. And the first one was conflict of interest. And that was the fact that she previously represented the victim. And of course, you know, explain to the defendant, I want you to tell me, and as much detail as you possibly can, what it is that you feel justifies each of the bullet points that you have put in your motion, and as to issue number one, which is the conflict of interest, the defendant said nothing he said I have nothing further to offer. So clearly the only conflict of interest claim he was making is per se. And in the follow up hearing the motion to set aside or I forget how it was phrased but the motion for new trial whatever it was, that was heard a week later. I think defendants claiming now on appeal that there was an affidavit of truth found by the defendant which re raised these issues, and it did not defend it had Apple opportunity to try to suggest what it was his counsel did or did not do, and he simply didn't do it. There was nothing there, he had no basis with which to claim an actual conflict. Thank you. If the court has no further questions on any other issues. I see none. Thank you, Your Honors. Yes, I will take a few minutes if I may. First on the issue of forfeiture for issue one, this issue was not forfeited, where the defense counsel objected to the certificates submitted by the state on the basis of foundation grounds and the record makes this clear. After the state shored up the people versus Kent deficiency in the certificate certifications and came back with a new set of certifications right before trial began, counsel did object again and objected to the certifications, arguing that they did not the prosecutor below recited the under the penalty of perjury language in the certifications themselves, and the trial court clearly understood the nature of that objection, because it's expressed rationale for denying Fox's objection was as follows quote the certifications were declared under penalty of perjury, and I think they now comply with the rule and also with the campaign's, so I'm going to reconsider my ruling and allow that unquote. So the court and the state, contrary to what opposing counsel suggests were aware of the nature of this objection, they did have an opportunity to comply by the rule which as the proponent of this evidence, where they were duty bound to do in the first And this issue is properly before this court for appellate review. In the event that the, that your honors find the issue forfeited, we have raised the issue as plain air in our briefs under the close to close the balance from. As justice statement pointed out the rule is straightforward and simply understood. The, the certifications must be under oath subject penalty of perjury, not either or not merely claim that they were that they're subject to penalty of perjury, they must be under oath, but there's no indication that these were given under oath. There is a violation of this rule of evidence. With respect to harmless error opposing counsel claims that there's no basis in the record to find harmless error, but the state's actions again at trial, tell a very different story. The state book ended its case with voluminous cell phone records. With a long exposition of those records through the testimony of expert testimony of detective daily, who went through reams and reams of transcript describing the cell phone records, and how we interpreted them, how we interpreted them not only to figure out who called whom at what time, but also to derive from that that data cell phone tower location information. And that was not some afterthought it was not some minor thing that the state threw in at trial, it was a very important part of their prosecution. The defense, pardon me, the prosecutor stated the records have nothing to do with Ashley was testimony. Well, the state explicitly told the jury that the quote the phone evidence puts the three defendants in the range of the crime scene at the time of the murder. So that right there is the state's exploitation of this inadmissible evidence for purposes of implicating the defendant in the shooting. Stephanie bad system of testimony is not only critical to the conviction is central to the state's case. And that would that would not be the opposing counsel's, you know, kind of shooing a shooing of Stephanie bad testimony would not be news only to the jury but to the prosecutor, who emphasized how truthful she was because her testimony aligned with the opposing counsel stated all the records show is time of a call. That's not true. Don't take my word for it. Look at the deck of powerful point slides that detective daily presented to the jury, complete with numerous maps, indicating where the trajectory from the cell phone tower could locate the defendant, not with a pinpoint accuracy, mind you, but showing that he had to be somewhere within this wedge of space, and it all tracked what Stephanie Babs has said, without that cell phone evidence, her testimony is much weaker and the state's case is much. The crankle inquiry was not exemplary by the judge, the state notes that the Fox said nothing when given an opportunity at the crankle inquiry, but it's not the defendants obligation to flesh out an ineffective assistance or a conflict of interest conflict of interest trial. And in that motion, it contained an affidavit from Darrell Fox into itemizing how Karen route had misrepresented their prior conversations about the conflict, but basically indicating that she had misrepresented facts to travel. I see that I have no time, so I will wrap it up there but I think you guys, your honors for your time, I think appellate account opposing counsel for his time and I, I asked that you remand the case for a new trial or for further post trial proceedings. Thank you. Thank you counsel. Thank you both. But we'll take this matter of advisement, and now stands and recess.